**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------×

HOPE LEVY,

        *Plaintiff,*

      *v.*

PREMIER
HEALTHCARE, INC,
YAI, ALEK HOYOS, JEFF
MORDOS, KEVIN
CAREY, and ANTHONY
OTTRANDO,

        *Defendants.*
---------------------------------------------×

      **AMENDED**
      **COMPLAINT**

      **1:23-cv-1387**

      **JURY REQUESTED**

Plaintiff Hope Levy, by her counsel, The Harman Firm, LLP, alleges for her First Amended Complaint against Defendants Premier HealthCare, Inc, YAI, ("Corporate Defendants") Alek Hoyos, Jeff Mordos, Kevin Carey, and Anthony Ottrando ("Defendants") as follows:

**PRELIMINARY STATEMENT**

1.     This case is about Hope Levy, a woman, who endured severe and pervasive discrimination based on gender and sex, and, as well, retaliation for raising complaints about health and safety and compliance issues.

2.     The highest income earners at YAI are all male and they receive substantial raises each year. Plaintiff, a woman, earns substantially less than similarly situated male employees and has not been given any substantial raises except for a "cost of living raise" in 2022 to match inflation.

3.     Plaintiff was the Executive Director of Premier HealthCare Inc. ("PHC"), a sole member of YAI and is wholly owned by YAI, and was retaliated against and, ultimately, terminated for a pretextual reason because she complained about bona fide compliance, health, and safety concerns.

1

4.     Plaintiff was paid less than her male predecessors and much less than the YAI Chiefs discussed below.

5.     Defendants' work environment has been long riddled with discriminatory animus. Vocabulary used to describe meetings, where only men are invited, shows a clear preference for male authority figures.

6.     Plaintiff was subject to discriminatory animus after raising concerns over health and safety and compliance issues.

## JURISDICTION

7.     Pursuant to 28 U.S.C. §1331, this Court has proper jurisdiction as the claims arise under a federal statute, Title VII, 42 U.S.C. §2000 *et seq*., and the Equal Pay Act.

8.     Pursuant to 28 U.S.C. §1367, this Court has jurisdiction over Plaintiff's State law claims as the arise out of the same nucleus of operative facts so as to form the same case or controversy as Plaintiff's federal claims.

## PARTIES

9.     Plaintiff was and is a resident of New York.

10.     Defendant Premier HealthCare, Inc was and is an entity under the laws of the State of New York with a principal place of business at 220 East 42st Street, New York, New York 10017.  Premier HealthCare, Inc is a sole member of YAI and is wholly owned by YAI.

11.     PHC is a specialty clinic regulated by the Department of Health and the Office of People with Developmental Disabilities and serves children and adults with developmental disabilities and the vast majority of patients have one or more chronic conditions that put them at high risk of serious illness or death if they contract COVID.

12.     Defendant YAI was and is incorporated under the laws of the State of New York and has a principal place of business at 220 East 42nd Street, Eighth Floor, New York, New York 10017.

2

13.     PHC is a sole member affiliate of YAI and has a management agreement with YAI for all back office and infrastructure support including Human Resources, Information Technology, Compliance, and Fiscal services.

14.     Alek Hoyos is a senior executive at YAI and is a resident of New York.

15.     Jeff Mordos is a board chair for PHC and YAI and is a resident of New York.

16.     Kevin Carey is the interim YAI CEO and is a resident of New York.

17.     Anthony Ottrando is a senior executive at YAI and is a resident of New York.

## JURY DEMAND

18.     Plaintiff respectfully requests a trial by jury.

## STATEMENT OF FACTS

### BACKGROUND FACTS

19.     Plaintiff has been the Executive Director of Premier HealthCare, Inc (PHC) for five years, starting in 2017.

20.     During Plaintiff's employment she received excellent evaluations by the CEO and PHC board annually, and was recognized in a number of publications, such as Crains, for her exemplary work.

21.     At no point in her career was Plaintiff subject to a negative performance review until she complained about serious health and safety and compliance failures related to the urgent healthcare needs of children and adults with developmental disabilities.

22.     During her time, she was also witness to a number of female coworkers being disparaged and treated differently in a work environment controlled and dominated by men.

23.     The top salaries currently at YAI are all men and there were no women who held a chief position at YAI at Plaintiff's termination.

24.     Over the last six (6) years there have been six (6) women who have held chief

positions and five (5) of the six (6) have been terminated.

25.     The sixth (6th) resigned due to gender-based hostility by Leadership, specifically the Chief of Human Resources Anthony Ottrando attitude and demeanor towards her and other women.

26.     Plaintiff also had her own complaints about Ottrando, both for how he treated her personally and how he treated women at PHC and YAI.

27.     Ottrando had a pattern of making unilateral decisions regarding PHC such as cutting benefits, and when asked why he did this and why he felt he had unilateral authority to cut paid time off for new hires under Plaintiff's organization during the pandemic, he became hostile and aggressive.

28.     Ottrando responded that Plaintiff was "at the meetings" when this decision was made, but Plaintiff confirmed, on the spot, with then-CEO George Contos that this was not true, and that Plaintiff was never invited to the meetings.

29.     Contos also confirmed he did not have knowledge that the benefits decrease was meant for PHC employees.

30.     In 2021, Ottrando unilaterally decided to take a PHC medical recruiter and allocate his time to recruit for YAI residential programs.

31.     When this was brought to the CEO's attention, Plaintiff was directed by the CEO to ask Ottrando for a plan on how he will ensure PHC has the appropriate nursing and healthcare staff.

32.     Ottrando was angry at Plaintiff's request and repeatedly called the Plaintiff that day making angry and intimidating accusations.

33.     Plaintiff filed a written complaint with the CEO and the Director of Diversity and Inclusion and had an in-person meeting with Joshua Trinidad.

34.     Joshua Trinidad, Director of Diversity and Inclusion, said that Plaintiff was only one of many complaints about Ottrando, most of which related to his demeaning attitude towards women.

35.     Trinidad also reported that he had met with Mordos and discussed gender bias among YAI leadership.

36.     Trinidad reported that Mordos was not interested in addressing the gender issues at a board level.

37.     YAI also fired the executive director of one of the affiliates, iHope, who is also a woman, after she expressed compliance concerns to Carey, who is the iHope board chair.  The reason, however, given for why she was fired was that she 'could not get along with co-workers.'

38.     During the same time period as Plaintiff's employment, six (6) years, only one (1) man who held a chief position was terminated.

39.     YAI employs over 5,000 individuals, and its workforce is 70% female, but there were no women who held a chief position at the time of Plaintiff's termination.

40.     Under Plaintiff's leadership and through intensive restructuring, PHC fiscally broke even in 2018 and became profitable in 2019, for the first time since 2010.

41.     PHC is an essential service and remained opened for in person medical care throughout the COVID pandemic.

42.     Under Plaintiff's leadership, Premier was the first outpatient clinic to receive the Covid vaccine for its at-risk patient population.  As of November 2022, Premier had provided over 20,000 COVID vaccines to at risk patients and their healthcare staff including YAI employees.

43.     Plaintiff was recognized in 2021 and named a NY healthcare notable for her leadership during the pandemic.

COMPLIANCE COMPLAINT FACTS

44.     In September 2022, PHC electronic systems, such as its patient scheduling system (IDX), and call center portal, had been failing.

45.     Plaintiff complained to the PHC board about the issues in September 2022.

46.     Specifically, caregivers, patients, and other organizations could not get through to the clinics for needed medical care.

47.     As part of YAI's previous corporate integrity agreement with the federal government and its current Policy Statement that requires they Comply with the Deficit Reduction Act of 2005, YAI was required to ensure it had appropriate policies and procedures for reporting compliance concerns and non-retaliation policies (GCP 8.01).

48.     As part of those required policies, there must be a Chief Compliance Officer and the responsibilities of the compliance officer were outlined and approved by the State.

49.     However, in 2021, the Chief of Compliance was terminated and had not been replaced as of October 2022.

50.     YAI did not appoint an interim Chief of Compliance.

51.     Plaintiff continued to bring the vacant Chief of Compliance concern to Ottrando and Carey, but the concern was ignored.

52.     PHC's phone systems, which take in 400 calls per day, were crashing frequently in 2021 and 2022, particularly in August 2022 the call center went down for three consecutive days and part of the fourth day.

53.     A Director of nursing at an organization for people with disabilities texted Plaintiff:

it's a disaster right now. can't get my plans or med request. back to the good old days calling and waiting for someone to get back to us!
Worst part is that I didn't even know how much it was going to impact us. I literally had to send an email to my team on Monday because everyone was having a hard time getting thru to the premier. I screenshot my 1.5 hr wait time yesterday

54.     The impact is that patients were unable to contact the nursing line, prescription

lines, or call agents to schedule appointments.  Since 2021, these phone lines would intermittently go down resulting in patients being unable to reach their medical provider which posed an extreme health and safety issue during the COVID pandemic.

55.    Starting in 2021, Plaintiff requested Hoyos replace the IT employee responsible for the call center oversight due to his inability to implement proactive planning and follow up.  Each time the call center went down, Plaintiff would make the request again.  Each time Hoyos refused.

56.    In September 2022, Plaintiff brought the issues directly to the PHC board and Chief of Staff Alex Hoyos immediately became hostile to her because he oversees the IT department.

57.    Plaintiff also told the board, during that meeting, that PHC did not have the compliance oversight required by the office of Medicaid inspector general, had no compliance coder from 2020 through 2022, had no Chief of Compliance from 2021 through 2022, and had a General Compliance position open since 2020.

58.    Plaintiff further explained that there were a number of health and safety issues, including lack of nursing staff at certain locations, lack of appropriate plastic barriers at nursing stations and reception (which were required by the Department of Health and OSHA), and the above reference electronic failures.

59.    Plaintiff had previously brought these health and safety issues to Hoyos, but the issues remained unchanged.

60.    Hoyos thereafter sent a letter to the PHC board that Plaintiff was "exaggerating" and "making it up."  Hoyos sent a document to the PHC board with inaccurate and misleading information to discredit Plaintiff.

61.    This interaction with Hoyos was one of the factors that ultimately led to Plaintiff's termination.

62.    Plaintiff reported the retaliatory behavior of Hoyos to the board chair on October

18, 2022.

63.     Plaintiff was placed on a leave shortly after this and was terminated after she put Defendants on notice that litigation was imminent.

64.     Therefore, her termination was in retaliation for raising her rights under anti-discrimination, health and safety, and compliance laws.

GENDER FACTS

65.     An overarching theme and culture at YAI is that women were treated differently and less than; the culture was male dominated and women were seen to be subservient and meant to 'fall in line' with the decisions made by the "All's Men's Meetings" which were <u>designed</u> to exclude women.

66.     Hoyos expected that, because Plaintiff was a woman, she was unfit to make compliance decisions or IT decisions.

67.     Hoyos would withhold contracts and would meet with Premier vendors such as Intrado, IDX, Nextgen and would make decisions on behalf of Premier without input or participation from Plaintiff.

68.     Plaintiff would request participation in meetings, but would not be allowed by Hoyos.

69.     In 2021, Plaintiff asked Hoyos to discontinue the contract with Intrado because they had not delivered the agreed upon services in over 12 months, but Hoyos did not terminate and instructed the IT staff to continue to work with the company.

70.     Hoyos continued to meet with the vendor until 2022.

71.     In July 2022, PHC employees, Mathew Chislom, Dr. Ben Chill, Dr. Steven Wolf, Patricia McGoldrick, and Marie Fonseca, complained that Hoyos was mismanaging the Nextgen upgrade.

72.     Hoyos made all the decisions around PHC's upgrades, without input from Plaintiff.

73.     In July 2022 Plaintiff asked Hoyos to include her in the Nextgen executive meetings being held to establish timelines for the EHR upgrade, but he instead only invited Plaintiff to the all-provider meetings.

74.     Plaintiff was also the only executive who had to ask Hoyos' permission when she needed the IT department to provide assistance to her organization.  No chief who ran a department needed to seek Hoyos' approval when they needed IT support.

75.     Hoyos would make the decision if the Plaintiff's request should be prioritized or left for a later time.

76.     Hoyos also prevented Plaintiff from accessing reports that identified how many days Premier's scheduling system (IDX) was down instructing his staff that she did not have permission to access the information.

77.     Hoyos, and Chief of HR Anthony Ottrando, as well as the other chiefs of YAI, have a culture of belittling and devaluing women.

78.     When Plaintiff or other women would raise health and safety issues, male chiefs, especially Hoyos and Ottrando, would say "she is being hysterical and exaggerating."  Ottrando frequently referred to Plaintiff as "crazy."  These terms were never used to describe men.

79.     Women in leadership were not allowed to assert authority or hold chiefs accountable and, when they did, they were called derogatory terms.

80.     Specifically, their all-chiefs meeting is referred to as the "All men's meeting" and Marie Cavallo, who was employed as chief of compliance, was not invited to the meetings.

81.     If Plaintiff were a man she would be participating in the "All men's meeting," and would be part of the decision making for the organization which she runs.

82.     The "All men's meetings" were held three to four times per week.  These meetings

were held in order to make policy and procedural and general organizational decisions regarding YAI and Premier.

83.     Plaintiff was never invited to the "All men's meetings."

84.     A meeting occurred on September 30, 2022 between Plaintiff and Hoyos.  Hoyos informed Plaintiff that he had just been in a meeting with the CEO, George Contos, and CFO Kevin Carey and they were moving ahead with an upgrade date for PHC that Plaintiff was not comfortable with.

85.     Plaintiff decided to speak with the CEO Contos as it was unusual for him to make decisions without her input.

86.     Bizarrely, Hoyos told Plaintiff that Contos refused to meet with her or discuss the upgrade with her.

87.     This was bizarre because Plaintiff and Contos have a great relationship, so she simply texted him to ask whether this was true, and Contos told her it was absolutely not true.

88.     When Plaintiff would be scheduled for PHC's quarterly board meeting, Ottrando, Chief of Human Resources, would say to her "don't get me in trouble" which meant she should not tell the board about any Human Resources issues.

89.     Ottrando also made these comments when Plaintiff would speak to Contos.

90.     Plaintiff also witnessed a number of instances when women were belittled at YAI.

91.     Plaintiff personally observed Chief of Programs Ravi Dahiya screaming at Marie Cavallo in public, who was the Chief of Compliance at the time, because she was raising program issues.  He never faced any repercussions for this extremely unprofessional behavior, but Cavallo was eventually terminated in 2021.

92.     Brigida Hernandez had worked at YAI since 2009.  In 2018 the YAI CEO promoted Hernandez to a chief position. Shortly after her promotion to chief, she began to experience hostile

and inappropriate behavior by Ottrando.  This behavior ultimately led to her resignation in 2019.

TERMINATION

93.     At the September 20, 2022 PHC Board meeting, Plaintiff raised compliance, health, and safety issues.

94.     After the board meeting Hoyos became increasingly difficult to work with, becoming even more hostile and controlling, and frequently stepped outside his domain to act as if he was in charge of PHC.

95.     On September 30, 2022 Hoyos informed Plaintiff that he was scheduling her clinics electronic health record upgrade for December 19, 2022.

96.     Plaintiff said this was too close to the holidays, it was Hannukah, as much of her staff would be out.

97.     Hoyos told Plaintiff that he had spoken to the CEO George Contos and CFO Kevin Carey and the decision was made that it must be December 19, 2022.

98.     Plaintiff immediately texted Contos asking if he was free to meet on Thursday or Friday; Contos responded that he was.

99.     Plaintiff also sent a meeting request to Hoyos to schedule a meeting for her and Contos as that was the standard process.

100.     Hoyos then told Plaintiff that Contos would not meet with her and that he did not want to speak with her.

101.     Plaintiff immediately texted Contos "Confused Alek just called me said you do not want to meet or talk to me."

102.     Contos responded "Now you have me confused because I never said anything even remotely like that nor did he even ask anything about you."  "I'm outside but will ask him to explain what's up when I see him."

103.    Plaintiff responded "Perplexed myself.  I swear that is what he told me.  I was literally crying".

104.    Less than two weeks later, Contos resigned.

105.    On October 11th, the day Contos resignation was officially announced, Kevin Carey, acting as interim CEO, Mordos, YAI and PHC board chair, and Ottrando pulled Plaintiff into a meeting.

106.    Plaintiff was told, by Mordos, that she was doing a great job and that she "shouldn't be concerned," but that there were a number of complaints against her from employees and they wanted her to get coaching.

107.    Plaintiff asked for examples of these "complaints" so she could get coaching.

108.    Ottrando, Carey, and Mordos could not give any details or even identify a single person who complained.

109.    Plaintiff, during this meeting, also notified Mordos, Carey, and Ottrando that she believed the work environment was toxic and that she was treated differently because she was a woman and that women in the organization are held to a different standard.

110.    The next day, October 12, 2022, Plaintiff met with Ottrando in order to discuss the complaints and get examples, as he is Chief of Human Resources.

111.    Ottrando asked "on a scale one to five, how unhappy are you"?

112.    Ottrando expressed that YAI should have never kept Plaintiff in her position after she made PHC profitable.

113.    Plaintiff was surprised at this as she, and PHC under her leadership, had prioritized the health and safety of all their patients and the healthcare professional who serve them including YAI employees. She had worked 6 days per week during the pandemic in order to best support individuals with disabilities who are at high risk providing vaccinations and COVID testing.

114.     Plaintiff felt attacked by Ottrando.

115.     Ottrando reiterated the baseless complaints, saying there were more than twenty-five complaints, including complaints from PHC and YAI employees as well as vendors and affiliates, but when repeatedly asked for examples by Plaintiff, Ottrando shared only two: that Plaintiff "interrupted someone during a meeting" and "slammed her hand on the desk" another time.

116.     This was strange at best because Plaintiff only directly oversees five employees, and has very limited, if any, interactions with vendors and affiliates.

117.     When asked, Ottrando could provide no specific vendors or affiliates who complained about Plaintiff.

118.     Following this, on October 18, 2022, Plaintiff met with Mordos, who explained that that this all started after Plaintiff complained at the September 20, 2022 board meeting about health and safety and compliance issues.

119.     Mordos reported that after the meeting "his phone began to ring off the hook." YAI Chiefs called him and informed him that Plaintiff was exaggerating and brought up, for the first time, that there are complaints against her.

120.     At the meeting on October 18, 2022, Plaintiff expressed to Mordos that she felt the recent complaints reported by Ottrando were retaliatory and fabricated and were only brought up after she complained to the board regarding health and safety and compliance issues.

121.     On the evening of October 18, 2022, Plaintiff was sent documents by Mordos that were prepared by Hoyos. Plaintiff responded that they were inaccurate and misleading, such as how Hoyos described phone lines as being down for one and a half days when really it was three to four days.

122.     Plaintiff expressed that she felt Hoyos and Ottrando's actions were retaliatory,

toxic, and hostile and that she was uncomfortable returning to work.

123.    Plaintiff was never told that there were complaints against her before she raised compliance, health, and safety concerns.

124.    Plaintiff met with Carey on October 24, 2022, and was told she was suspended pending an investigation of both her complaints and the complaints made by employees.

125.    On Monday October 24, 2022, less than a month after compliance issues were raised and less than two weeks after Plaintiff raised retaliation and gender concerns, she was suspended.

126.    On November 2, 2022, Plaintiff was contacted by a Human Resources investigator. The investigator revealed that Ottrando had hired her and was heading the investigation and that she had received all documents from him.

127.    The investigator did confirm that there were <u>not</u> twenty-five complaints about Plaintiff.

128.    Ottrando did not give the investigator the complaint Plaintiff had filed against him.

129.    On December 12, 2022, Plaintiff sent a litigation hold letter to Defendant.

130.    On December 20, 2022, Defendant sent Plaintiff a separation agreement, indicating her employment was at an end.

131.    Between November 2, 2022 and December 20, 2022, Plaintiff was given no information and was seemingly cut off from PHC.

132.    In fact, Plaintiff was instructed not to respond to <u>anyone</u>, and Plaintiff had to ignore all work emails.

133.    Plaintiff was not called for any meetings with Human Resources and was never given a chance to explain any complaints about her, or given any details, and it is clear no legitimate complaint existed.

134.    Plaintiff had never received a performance improvement plan or had any progressive discipline, as is the policy identified in the YAI employee handbook.

135.    Only after she raised compliance, health, and safety concerns, which are the departments Hoyos, as Chief of Staff, and Ottrando, as Chief of Human Resources, oversee, Plaintiff was retaliated against and terminated.

136.    If she was a man, Plaintiff would not have been subject to the retaliation.

137.    But Plaintiff is not a man, and the men from the "All men's meetings" sought to terminate her once a woman started complaining about compliance issues.

138.    Hoyos, Chief of Staff who initiated the retaliation, Ottrando, Chief of Human Resources who orchestrated the fabricated investigation and who was retaliating against Plaintiff due to previous complaints filed by the plaintiff, Mordos, YAI and PHC board chair, and Carey, interim CEO who has been close with Hoyos and Ottrando for years, terminated Plaintiff for a pretextual reason.

139.    They only claimed that Plaintiff was seen as 'difficult to work with' and "micromanaged" employees, but did not cite any performance issues.

140.    Defendants have a pattern and practice of discriminating against women.

141.    Mordos, Hoyos, and Ottrando have a clear history of discrimination against women.

142.    Plaintiff's termination was illegal and pretextual and would not have happened but for the fact that she was a woman who complained about compliance, health and safety, and gender issues.

143.    Following her illegal termination, Defendants hired a female Chief of Compliance, which was one of the position Plaintiff has originally complained about being empty.

## CAUSES OF ACTION

## FIRST CLAIM

### Equal Pay Act Violation

### Defendants YAI and PHC

144.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

145.    Plaintiff is a woman who succeeded a male employee, and that male made more money than Plaintiff, a female, for the exact same role.

146.    Male Chiefs at YAI were given substantial yearly bonuses.

147.    Plaintiff was only given a cost of living raises and in 2021, almost 4 years after assuming her role, after she complained about wage disparity, and asked YAI to conduct a salary survey.

148.    The salary survey demonstrated that the plaintiff was underpaid for her title and role and was given an increase in July 2021 as a cost of living raise.

149.    Plaintiff's position is as executive and senior as the male Chiefs.

150.    But for being a woman, Plaintiff would be making more money and would be given larger raises.

151.    The Equal Pay Act of 1963 covers all forms of wages – including salaries, bonuses, and raises.

152.    Plaintiff's job requires the same skill and effort as the Chiefs, she works in the same environment and within the same establishment, yet she is paid disproportionately and significantly less.

153.    Plaintiff seeks all remedies available to her under the law including front pay, back pay, emotional distress damages, costs, fees, expenses, and any other remedy the Court

deems justified.

## SECOND CLAIM

### Retaliation in Violation of New York Labor Law 740
### Defendants YAI and PHC

154.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

155.     Under the New York Labor Law §740, an "employer shall not take any retaliatory action against an employee" who discloses to a supervisor an activity "that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety." McKinney's Labor Law § 740(2)(a).

156.     It is also a violation to retaliate against an employee who "objects to, or refuses to participate in any such activity, policy or practice."  McKinney's Labor Law § 740(2)(a).

157.     Retaliation "means an adverse action taken by an employer or his or her agent to discharge … any employee or former employee exercising his or her rights under this section." McKinney's Labor Law § 740(1)(e).

158.     Plaintiff complained about serious technological deficiencies that impacted patient care and compliance and nursing shortages that impacted patient care as well as facility issues that impacted the health and safety of Premier's employees.

159.     Plaintiff complained to the chiefs and board that she reasonably believed that this was a violation of law, rule or regulation.

160.     Plaintiff complained to the chiefs and board that she reasonably believed that this practice was a substantial and specific danger to public health or safety.

161.     Defendants terminated Plaintiff almost immediately after these events.

162.     But for Plaintiff complaining about what she reasonably believed was a violation of law, rule or regulation and/or a substantial and specific danger to the public health or safety, she would not have been terminated by Defendants.

163.     Plaintiff seeks all remedies available to her under the law including front pay, back pay, emotional distress damages, costs, fees, expenses, and any other remedy the Court deems justified.

## THIRD CLAIM

**Gender Discrimination in violation of Title VII, the New York State Human Rights Law, and the New York City Human Rights Law**

**Defendants YAI, PHC, and Hoyos, Mordos, Carey, and Ottrando, as individuals**

164.     Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

165.     Plaintiff is a woman, a protected category under Title VII, 42 USC §2000 *et seq*., the New York State Human Rights Law, and the New York City Human Rights Law.

166.     Title VII and the New York State Human Rights Law makes it illegal for a covered employer, which Defendants PHC and YAI are, to discriminate against someone because they belong to a protected category, such as gender.

167.     The New York City Human Rights Law tracks and incorporates The New York State Human Rights Law, but the New York City Human Rights Law also offers individual liability for covered employees, such as Defendants Hoyos, Mordos, Ottrando, and Carey, who discriminate against other employees.

168.     Plaintiff was subject to a work environment hostile to her gender.

169.     After Plaintiff raised her rights under anti-discrimination statutes, she was terminated.

170.    Plaintiff and other female coworkers were constantly subject to belittlement, were paid less that male coworkers, and had career opportunities stifled as the overly masculine culture at YAI prevented any ascendancy.

171.    Plaintiff was subject to a hostile work environment detailed in the paragraphs above.  Defendants PHC and YAI are liable under Title VII and the New York State Human Rights Law and the New York City Human Rights Law, and Defendants Hoyos, Mordos, Ottrando, and Carey are liable under the New York City Human Rights Law.

172.    Plaintiff seeks all remedies available to her under the law including front pay, back pay, emotional distress damages, costs, fees, expenses, and any other remedy the Court deems justified.

**FOURTH CLAIM**

**Retaliation for engaging in a protected activity under Title VII, the New York State Human Rights Law and the New York City Human Rights Law against Defendants YAI, PHC, and Hoyos, Mordos, Carey, and Ottrando, as individuals**

173.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

174.    Plaintiff is a woman, a protected category under Title VII, 42 USC §2000 *et seq*., the New York State Human Rights Law, and the New York City Human Rights Law.

175.    Title VII and the New York State Human Rights Law makes it illegal for an employer to retaliate against employees after they raise concerns of gender discrimination.

176.    The New York City Human Rights Law tracks and incorporates The New York State Human Rights Law, but the New York City Human Rights Law also offers individual liability for covered employees, such as Defendants Hoyos, Mordos, Ottrando, and Carey, who retaliate against other employees.

177.    Plaintiff complained that Defendant Ottrando had become hostile and

aggressive towards her after she challenged a false statement he made related to health and safety and compliance programs.

178.    Plaintiff would not have experienced aggression and intimidation if she were a man, this was reported to Joshua Trinidad, but nothing changed as Ottrando continued to be hostile and demeaning towards women and, specifically, Plaintiff when she challenged his authority.

179.    Plaintiff also, in October 2022, told Mordos that she felt the work environment was toxic, and that she was being retaliated against for raising compliance issues and that she would not have been retaliated against if she were a man.

180.    Shortly after this conversation, Plaintiff was suspended and ultimately terminated.

181.    Plaintiff was subject to a hostile work environment detailed in the paragraphs above.  Defendants PHC and YAI are liable under the New York State Human Rights Law and the New York City Human Rights Law, and Defendants Hoyos, Mordos, Ottrando, and Carey are liable under the New York City Human Rights Law.

182.    Plaintiff seeks all remedies available to her under the law including front pay, back pay, emotional distress damages, costs, fees, expenses, and any other remedy the Court deems justified.

## FIFTH CLAIM

**Withholding Unused Paid Time Off in Violation of Defendants' Policies as a Breach of Contract**

**Defendants YAI and PHC**

183.    Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

184.     Defendants PHC and YAI offer paid time off and sick pay for all employees.

185.     Defendant YAI's policy is to pay employees all unused paid vacation time up to 80 hours upon the end of their employment.

186.     Plaintiff has personal knowledge that a male employee who was terminated for failing to notify patients of abnormal labs, placing their health at risk, and failure to document over 300 patients' medical visits was paid his unused benefits.

187.     Another employee who abandoned her job was also paid her accrued vacation

188.     Plaintiff was not paid her unused paid time off after she was illegally terminated.

189.     Plaintiff was sent a letter informing her that her employment was terminated but gave her no other information.

190.     Plaintiff was told her employment ended on December 31, 2022, but was not told at the time why her employment ended.  After she raised her rights and claimed Defendants were retaliating against her, she was told her termination was "for cause."

191.     Plaintiff seeks all remedies available to her under the law including payment of unused benefits, unused paid time off, sick and vacation time, emotional distress damages, costs, fees, expenses, and any other remedy the Court deems justified.

## SIXTH CLAIM

### Retaliation in Violation of New York Labor Law §215

### Defendants YAI and PHC

192.      Plaintiff hereby realleges and incorporates each and every allegation contained in paragraphs 1 through 143 with the same force as though separately alleged herein.

193.     Plaintiff complained about compliance issues and understaffing at PHC.

194.     Plaintiff complained about gender discrimination at YAI.

195.     Plaintiff complained about not being paid her owed benefits, such as unused

paid time off.

196.    Plaintiff was not paid her management incentive bonus.

197.    New York Labor Law §215 makes it illegal for an employer to retaliate against an employee for complaining about what they reasonably believe is a violation of the New York Labor Law.

198.    Plaintiff complained about violations of the labor law.

199.    After Plaintiff complained she was "terminated for cause."

200.    But for her complaints, she would not have been terminated.

201.    Plaintiff seeks all remedies available to her under the law including front pay, back pay, emotional distress damages, costs, fees, expenses, and any other remedy the Court deems justified.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests the following relief:

A. For the first cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

B. For the second cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

C. For the third cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

D. For the fourth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

E. For the fifth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements;

F. For the sixth cause of action, damages for wages and emotional distress, compensatory damages yet to be determined, attorneys' fees, interest, costs and disbursements; and

G. For such other and further relief as the Court deems just and proper.

Dated: New York, NY

May 15, 2023

**THE HARMAN FIRM, LLP**

By: _Walker G. Harman, Jr._____

Walker G. Harman, Jr.
1270 Sixth Ave.
Suite 756
New York, New York
(646) 248-2288
wharman@theharmanfirm.com
*Attorney for Plaintiff*